**NOT YET SCHEDULED FOR ORAL ARGUMENT**

# United States Court of Appeals
# for the District of Columbia
# Circuit

## No. 22-7083

MARY OFISI; AARON MAKAU NDIVO; ADAM TITUS WAMAI; AGNES KUBAI; AGNES
WANJIKU NDUNGU; AISHA KAMBENGA; ALEX MBUGUA; ALEX MUNGUTI;
ALEXANDER VRONTAMITIS; ALI HUSSEIN ALI; ALICE KIONGO; ALICE MARITIM;
ALICE MARY TALBOT; ALISON MAFFRY; ALLAN OLAO; ALLY MAHUNDI; ANASTASIA
GIANPOULOS; ANDREW OFISI; ANDREW ONONO; ANDREW PUSSY; ANGELA BONYO;
ANGELA MWONGELI MUTISO; ANGELA WAMAI; ANIPHA MPOTO; ANN MBOGO; ANN
RUGURU; ANN SALAMBA; ANN WAIRIMU KIARIE; ANNAH MARITIM; ANNAH
WANGECHI; ANNASTACIAH LUCY BOULDEN; ANNE ADUNDO; ANNE NGANGA
MWANGI; ANTHONY KIARIE; ANTHONY NJOROGE; AQUILAS KALIO; ASHA KILUWA;
ASHA MAHUNDI; AUDREY PUSSY; AUGUST MAFFRY; BADAWY ITATI ALI; BAKARI
NYUMBU; BARBARA KIARIE; BARBARA MULI; BARBARA OLAO; BARNABAS
ONYANGO; BEATRICE AMDUSO; BEATRICE ATINGA; BEATRICE BWAKU; AMIRI
MAHUNDI; All Plaintiffs,

*Plaintiffs-Appellants,*

*v.*

BNP PARIBAS, S.A.; AL SHAMAL ISLAMIC BANK,

*Defendants-Appellees.*

*On Appeal from the United States District Court for the District of Columbia in
No. 1:15-cv-02010-JDB, John D. Bates, U.S. District Judge*

# BRIEF FOR DEFENDANT-APPELLEE BNP PARIBAS

CARMINE D. BOCCUZZI, JR.
MARK E. MCDONALD
KATHERINE R. LYNCH
CLEARY GOTTLIEB STEEN & HAMILTON LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000
cboccuzzi@cgsh.com
*Counsel for BNP Paribas*

December 1, 2022

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties

The Plaintiffs in the district court and the Appellants in this Court are:

Mary Ofisi, Aaron Makau Ndivo, Adam Titus Wamai, Agnes Kubai, Agnes

Wanjiku Ndungu, Aisha Kambenga, Alex Mbugua, Alex Munguti, Alexander

Vrontamitis, Ali Hussein Ali, Alice Kiongo, Alice Maritim, Alice Mary Talbot,

Alison Maffry, Allan Olao, Ally Mahundi, Amiri Mahundi, Anastasia

Gianpoulos, Andrew Ofisi, Andrew Onono, Andrew Pussy, Angela Bonyo,

Angela Mwongeli Mutiso, Angela Wamai, Anipha Mpoto, Ann Mbogo, Ann

Ruguru, Ann Salamba, Ann Wairimu Kiarie, Annah Maritim, Annah Wangechi,

Annastaciah Lucy Boulden, Anne Adundo, Anne Nganga Mwangi, Anthony

Kiarie, Anthony Njoroge, Aquilas Kalio, Asha Kiluwa, Asha Mahundi, Audrey

Pussy, August Maffry, Badawy Itati Ali, Bakari Nyumbu, Barbara Kiarie,

Barbara Muli, Barbara Olao, Barnabas Onyango, Beatrice Amduso, Beatrice

Atinga, Beatrice Bwaku, Beatrice Martha Kithuva, Belinda Akinyi Adika,

Belinda Chaka, Belinda Maloba, Belonce Murigi, Benson Bwaku, Benson Malusi

Musyoka, Benson Ndegwa, Bernard Adundo, Bernard Macharia, Bernard

Mutunga Kaswii, Bernard Onsongo, Bernice Ndeti, Beryl Shiumbe, Betty Kagai,

Beverlyne Ndeda, Blasio Kubai, Boniface Chege, Brian Kubai, Bryan Omori,

Caroline Karigi, Caroline Kasungo Mgali, Caroline Ngugi Kamau, Caroline

Okech, Caroline Wanjiru Gichuru, Caroline Wanjuri Kamau, Catherine Gitau, Catherine Gitumbu Kamau, Catherine Kalio, Catherine Mwangi, Catherine NjeriMwangi, Celestine Kubai, Charles Kabui, Charles Kagai, Charles Mungoma Olambo, Charles Mwaka Mulwa,  Charles Mwangi Ndibui, Charles Mwirigi Nkanatha, Charles Ochola, Charles Olewe, Charles Opondo, Christant Hiza, Christine Kavai Busera, Christine Mikali Kamau, Christine Nabwire Bwaku, Christopher Ndiritu, Civilier Mwaka, Clara Owino, Clifford Tarimo, Collin Kubai, Collins Aliviza, Conceptor Orende, Cornelius Kebungo, Daniel Kiarie, Daniel Kiongo Kamau, Daniel Kuya, Daniel Owiti Oloo, David Kamau, David Kiarie Kiburu, David Ngugi, Dawn Mulu, Debora Gwaro, Debra Mayaka, Dennis Okatch, Derrick Maloba, Diana Kibodya, Diana Macharia, Diana Nyangara, Diana Williams, Dick Obworo Mayaka,  Dickson Lihanda, Dixon Indiya, Dominic Musyoka Kithuva, Doreen Mayaka, Doreen Oport, Doreen Pussy, Dorine Bonyo, Duncan Nyoike Kamau, Edgar Maritim, Edith Njeri, Edmund Kiarie Kiburu, Edward Kung'u, Edward Mwae Muthama, Edwin Omori, Edwin Onsongo, Edwin Oyoo, Edwina Owuor, Elijah Bonyo Ochieng, Elizabeth Kiato, Elizabeth Maloba, Elizabeth Muli-Kibue, Elizabeth Nzaku, Elizabeth Okelo, Elizabeth Tarimo, Elly Musalia, Elsie Kagimbi, Elsie Pussy, Emily Minayo, Emma Mahundi, Emmanuel Gwaro, Emmanuel Minja, Emmanuel Musambayi Busera, Emmily Bulimu, Enna Omolo, Enoch Onsongo, Enos Nzalwa, Ephantus

Njagi Mbogo, Ephraim Onyango Bwaku, Erastus Ndeda, Eric Abur Onyango, Eric Mwaka, Ernest Gitau, Ester Nganga Mwangi, Eucabeth Gwaro, Evans Onsongo, Evitta Francis Kwimbere, Faith Kihato, Faith Maloba, Faith Murigi, Faith Mutindi, Faith Wanza Kamau, Felister Gitau, Felix Munguti, Felix Mwaka, Flavia Kiyanga, Florence Musalia, Florence Omori, Francis Kwimbere, Francis Maina Ndibui, Francis Mbogo Njung'e, Francis Ndungu Mbugua, Francis Ofisi, Francis Olewe Ochilo, Francis Watoro Maina, Franciso Kyalo, Frederick Kibodya, Frederick Kwimbere, Frederick Maloba, Frida Bulimu, Frida Yohan Mtitu, Fridah Makena, Gad Gideon Achola, Gaudens Thomas Kunambi, Geoffrey Kalio, Geoffrey Moses Namai, Geoffrey Tupper, George Magak Mimba, George Mwangi, George Onsongo, Gerald Bochart, Gerald Owino, Gideon Maritim, Gideon Ofisi, Gitonga Mwanike, Gladis Lihanda, Gladys Munani Musyoka, Gladys Onsongo, Godfrey Bulimu, Grace (Eunice) Onsongo, Grace Gicho, Grace Godia, Grace Kimani, Grace Kimata, Grace Makasi Paul, Grace Wanjiru Waithira, Greg Owino, Hamida Idi, Hannah Ngenda Kamau, Hannah Wambui, Harriet Chore, Harrison Kimani, Hellen Maritim, Hellen Okelo, Henry Aliviza Shitiavai, Henry Bathazar Kessy, Hesbon Bulimu, Hesbon Lihanda,  Hilario Ambrose Fernandes, Hindu Omari Idi, Hosiana Mbaga, Hudson Chore, Humphrey Aliviza, Humphrey Kiburu, Hussein Ramadhani, Immanuel Mdobilu, Inosensia Mpoto, Ireen Semo, Irene Khabuchi, Irene Kung'u, Irene Kwimbere,

Isaac Kariuki Mbogo, Isidore Adundo, Jacinta Wahome, Jackline Achieng,

Jackson Bulimu, Jackson Kithuva Musyoka, Jackson Ndungu, Jacob Gati,

Jacqueline Aliviza, Jacqueline Kihato, Jael Oyoo, Jairus David Aura, James

Chaka, James Mukabi, James Ndeda, Jamleck Gitau Ndungu, Janathan Okech,

Jane  Ikonye Kiarie, Jane Kamau, Jane Kathuka, Jane Khabuchi, Jane Mutua,

Japeth Godia, Jeffrey Mbugua, Jennifer Njeri, Jennifer Wambui, Jerry Omori,

Joab Amduso, Joan Adundo, Joan Kamau, Joan Kendi Nkanatha, Joanne Oport,

Joash Okindo, Joel Gitumbu Kamau, John Kiswili, John Mdobilu, John Muiru

Ndungu, John Muriuki, John Ndibui, John Nduati, John Ngugi, John Ngure, John

Ofisi, Jomo Matiko Boke, Jonathan Nduti, Joseph Abdallah, Joseph Gathunga,

Joseph Ingosi, Joseph Kamau Kiongo, Joseph Kambo, Joseph Ndungu Waithira,

Joseph Wahome, Joshua Mayunzu, Josiah Owuor, Josinda Katumba Kamau,

Jotham Godia, Joyce Mutheu, Joyce Onyango, Joyce Thadei Lokoa, Judith Nandi

Busera, Judy Aliviza, Judy Kiarie, Juliana Onyango, Juliet Olewe, Julius

Nyamweno,  Julius Nzivo, Julius Ogoro, Juma Mahundi, Juruha Musalia, Justin

Amduso,  Justina Mdobilu, Kaka Abubakar Iddi, Kamali Musyoka Kithuva,

Katherine Mdobilu, Katherine Mwaka, Katimba Mohamed Selemani, Keeliy

Musyoka, Kelesendhia Apondi Onyango, Kennedy Okelo, Kenneth Maloba,

Kenneth Owino, Kimeu Nzioka Nganga, Kirumba W'mburu Mukuria, Laura

Onono, Lawrence Ambrose Gitau, Leah Owino, Leilani Bower, Leonard Rajab

Waithira, Leonard Shinenga, Leonidas Vrontamitis, Leslie Onono, Leslie Sambuli, Levina Minja, Levis Madahana Busera, Lewis Maloba, Lilian Kalio, Linda Oyanda, Livingstone Busera Madahana, Lloyd Wamai, Loise Kuya, Lorna Kung'u, Lucy Chege, Lucy Gitau, Lucy Grace Onono, Lucy Kambo, Lucy Kiongo, Lucy Mwangi, Lucy Nyawida Karigi, Lukas Kimeu, Lydia Bulimu, Lydia Gwaro, Lydia Muriki Mayaka, Lydia Ndivo Makau, Lydia Nyaboka Otao Okindo, Lynette Oyanda, Magdaline Owiti, Mahamud Omari Idi, Majdoline Abdallah, Manzi Musyoka, Margaret Gitau, Margaret Maloba, Margaret Murigi, Margaret Mwangi Ndibui, Margaret Njoki Ngugi, Margaret Nzomo, Margaret Tarimo, Margaret Waithira Ndungu, Marini Karima, Marita Onyango, Marlon Maloba, Martin Karigi, Mary Bulimu, Mary Gitonga, Mary Meresiana Paul, Mary Mudeche, Mary Muiriri, Mary Munguti, Mary Muthoni Ndungu, Mary Ndambuki, Mary Nzisiva Samuel, Caroline Maffry, Mary Onsongo, Maryann Njoki Kiarie, Maureen Ndeda, Maurice Okatch Ogolla, Menelik Kwamia Makonnen, Merab Godia, Mercy Ndiritu, Mercy Wairumu Kamau, Mercy Wanjiru, Michael Ikonye Kiarie, Michael Kimeu, Michael Mwangi, MichaeNgigi Mworia, Michael Tsuma, Michael Ware, Milka Wangari Macharia, Millicent Bulimu, Milly Mikali Amduso, Mischeck Murigi, Misheck Mbogo, Mohamed Abdallah Mnyolya, Monica Wangari Munyori, Monicah Kamau, Monicah Opati, Mordechai Thomas Onono, Moses Kinyua, Muraba Chaka, Mwajabu Mahundi,

Mwajumba Mahundi, Nafisa Malik, Nancy Macharia, Nancy Mbogo, Nancy Mimba Magak, Nephat Kimathi Mbogo, Newton Kamau, Ngugi Macharia, Nicholas Mutiso, Nickson Minja, Nigeel Namai, Norman Kagai, Nuri Hamisi Sultani, Nyangoro Mayaka, Omar Idi, Omar Zubari Omar, Onael Mdobilu, Pankaj Patel, Patrick Nyette, Patrick Okech, Paul Ngugi, Paul Onyango, Paul Vrontamitis, Pauline Abdallah, Pauline Adundo, Pauline Kamau, Pauline Kamau Kiongo, Peninah Mucii, Peris Gitumbu, Peris Onsongo, Peter Kamau, Peter Kamau Kiongo, Peter Kunigo, Peter Kuya, Peter Macharia, Peter Mdobilu, Peter Mwaka, Peter Ngigi Mugo, Peter Ngugi, Petronila Munguti, Phaedra Vrontamitis, Phelister Okech, Philemon Oport, Phillip Kamau, Phoeba Ndegwa, Phoebe Kebungo, Pinina Onsongo, Polychep Odihambo, Prisca Owino, Priscila Okatch, Purity Mahonja, Rachael Mungasia Pussy, Rachel Oyanda Otieno, Rael Ochola, Rael Opati, Ramadhani Mahundi, Rammy Rotich, Raphael Kivindyo, Raphael Peter Munguti, Rashid Katimba, Rashid Omar Idi, Rehana Malik, Reuben Nyaga Mbogo, Rispah Abdallah, Rispah Auma, Rodgers Bulimu, Ronald Okelo, Rose Nyette, Roselyne Ndeda, Rosemary Anyango Okatch, Rosemary Olewe, Rukia Wanjiru Ali, Ruth Gatwiri Mwirigi, Ruth Lihanda, Ruth Maritim, Ruth Nduta Kamau, Said Mahundi, Sajjad Gulamaji, Salima Ismail Rajabu, Sally Cecilia Mamboleo, Sally Oport, Salome Onsongo, Salome Ratemo, Sammy Mwangi, Sammy Ndungu Kiarie, Sammy Okere, Samson Ogolla Okatch, Samuel

Adundo, Samuel Mbugua Ndungu, Samuel Odhiambo Oriaro, Samuel Pussy,

Sani Kwimbere, Sarah Mbogo, Sarah Tikolo, Sedrick Nair, Selifah Opati, Selina

Boke, Shaban Mahundi, Sharon Maloba, Sharone Maritim, Sheila Maritim,

Simon Ngure,  Solomon Mbugua, Stacy Chaka, Stanley Chaka, Stanley Kinyua

Macharia, Stanley Ngugi, Stanley Nyoike, Stella Mbugua, Stephen Muli, Stephen

Njuki Mbogo, Stephen Onono, Steve Kihato, Steven Karigi, Steven Maloba,

Susan Gitau, Syuindo Musyoka, Tabitha Kagai, Tabitha Kalio, Techonia Owiti,

Theresa Adundo, Thomas Adundo, Tibruss Minja, Tilda Abur, Titus Kyalo

Musyoka, Titus Wamai, Tobias Oyanda Otieno, Tony Kihato Irungu, Trusha

Patel, Valentine Ndeda, Valerie Nair, Vallen Andeyo, Velma Bonyo, Vera Jean

Oyanda, Victor Adeka, Victor Mpoto, Victor Watoro, Vincent Kamau Nyoike,

Vincent Owuor, Violet Minja, Wallace Njorege Nyoike, Wambui Kung'u,

Warren Owuor, Wellington Oluoma, Wendy Kagai, Wendy Olewe, William

Maina, Winfred Maina, Winfred Wamai, Winnie Bonyo, Winnie Kimeu,

Wycliffe Ochieng Bonyo, Wycliffe Okello Khabuchi, Yusuph Mahundi, Yvonne

Oport, Zackaria Musalia Atinga, Zakayo Matiko, Zephania Mboge.

Defendants in the district court were BNP Paribas S.A. and Al-Shamal

Islamic Bank.  The Appellee in this Court is BNP Paribas S.A.; Plaintiffs

voluntarily dismissed their claims against Al Shamal Islamic Bank.

No *amici* have entered appearances in this case.

**B.    Rulings Under Review**

The following rulings by District Judge John D. Bates are under review in this appeal:

- September 29, 2017 Order and Memorandum Opinion ("MTD Decision"), ECF Nos. 30 and 31, Joint Appendix ("JA") 222–57 granting Defendant BNP Paribas's motion to dismiss;

- January 11, 2018 Order and Memorandum Opinion ("Reconsideration Decision"), ECF Nos. 37 and 38, JA258–69, denying Plaintiffs' motion for reconsideration of the MTD Decision; and

- May 10, 2022 Order, ECF No. 97, JA279, entering final judgment and dismissing the underlying civil action.

**C.    Related Cases**

This case was previously before this Court in *Ofisi, et al. v. BNP Paribas, S.A., et al.*, No. 18-7007, when Plaintiffs filed an interlocutory appeal of the district court's Orders granting BNP Paribas's motion to dismiss and denying Plaintiffs' motion for reconsideration, ECF Nos. 30 and 37 (JA222, JA258), despite there being no appealable final order at that time. The prior appeal was voluntarily dismissed without prejudice on February 26, 2018.

There are no currently pending related cases.

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1(a) of the Federal Rules of Appellate Procedure, the undersigned counsel for the Defendant-Appellee state that BNP Paribas S.A. has no parent company, is a publicly-traded company organized under the laws of France, and no publicly-held corporation owns 10% or more of its shares.

# TABLE OF CONTENTS

**Page**

CERTIFICATE AS TO PARTIES, RULINGS, AND
RELATED CASES ............................................................... i

CORPORATE DISCLOSURE STATEMENT ............................................. ix

TABLE OF AUTHORITIES ........................................................... xii

GLOSSARY ........................................................................ xvv

COUNTERSTATEMENT OF THE ISSUES ................................................ 1

STATUTES AND REGULATIONS .................................................... 1

COUNTERSTATEMENT OF THE CASE .................................................. 1

I.      THE ALLEGATIONS OF THE COMPLAINT ................................... 2

        A.      Allegations Based on BNPP's June 2014
                Agreements.................................................... 3

        B.      Conclusory Allegations Regarding BNPP's
                Purported Connections to Sudan, Al Shamal Bank
                and al Qaeda ................................................. 6

II.     THE DISTRICT COURT'S RULINGS ............................................. 9

        A.      Motion to Dismiss Decision ..................................... 9

        B.      Reconsideration Decision........................................ 14

        C.      Subsequent Procedural History ................................. 15

III.    THIS COURT'S *OWENS V. BNP PARIBAS* DECISION ................... 15

SUMMARY OF THE ARGUMENT..................................................... 18

STANDARD OF REVIEW........................................................... 20

ARGUMENT ....................................................................... 21

I.      The Supreme Court's Ruling in *Jesner v. Arab Bank*
        Forecloses Plaintiffs' ATS Claims ......................................    21

II.     The District Court Correctly Concluded that the
        Complaint Fails to State a Claim for Relief Under the
        ATA ...............................................................................    233

        A.      *Owens v. BNP Paribas* Forecloses Plaintiffs'
                Proximate Causation Arguments................................    233

        B.      The Complaint Independently Fails to Satisfy the
                ATA's Act of International Terrorism Element.........    27

III.    The District Court Correctly Held that Plaintiffs Fail to
        State Common Law Secondary Liability Claims ................    30

        A.      Plaintiffs Should Not Be Permitted to End Run
                JASTA's Limitations Via Recourse to "Federal
                Common Law" ............................................................    30

        B.      The Complaint Fails to Plausibly Allege Common
                Law Conspiracy Liability...........................................    33

        C.      The District Court Properly Dismissed Plaintiffs'
                Aiding and Abetting Claims.......................................    377

                1.      *The Complaint Fails to Plead that BNPP Was
                        Generally Aware of Its Role in al Qaeda's
                        Terrorist Activities* ................................................    37

                2.      *The Complaint Fails to Plead BNPP's Knowing
                        and Substantial Assistance to al Qaeda* ................    41

CONCLUSION ............................................................................    477

STATEMENT OF COMPLIANCE ...............................................    488

STATUTORY ADDENDUM ......................................................... Add. 1

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abur v. Republic of Sudan*,
  437 F. Supp. 2d 166 (D.D.C. 2006)....................................................32

*American Ins. Assn. v. Garamendi*,
  539 U.S. 396 (2003)........................................................................32

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009).........................................................................20

*Atchley v. Astrazeneca UK Ltd.*,
  22 F.4th 204 (D.C. Cir. 2022).........................................................26, 41, 42, 46

*Bernhardt v. Islamic Republic of Iran*,
  47 F.4th 856 (D.C. Cir. 2022) ............... 20, 26, 34, 36, 38, 39, 40, 43, 44, 45, 46

*Boim v. Holy Land Found. for Relief & Dev.*,
  549 F.3d 685 (7th Cir. 2008) ...........................................................27

*Carney v. Am. Univ.*,
  151 F.3d 1090 (D.C. Cir. 1998).........................................................30

*Crosby v. Nat'l Foreign Trade Council*,
  530 U.S. 363 (2000).........................................................................32

*Edmondson & Gallagher v. Alban Towers Tenants Ass'n*,
  48 F.3d 1260 (D.C. Cir. 1995)..........................................................32

*Halberstam v. Welch*,
  705 F.2d 472 (D.C. Cir. 1983)............................ 1, 10, 13, 19, 33, 34, 37, 42, 45

*Hernandez v. Mesa*,
  140 S. Ct. 735 (2020)........................................................................31

*Honickman v. BLOM Bank SAL*,
  6 F.4th 487 (2d Cir. 2021) ................................................................39

*Jesner v. Arab Bank, PLC,
    138 S. Ct. 1386 (2018).............................................. 1, 13, 18, 19, 21, 22, 30, 32

Kaplan v. Cent. Bank of the Islamic Republic of Iran,
    896 F.3d 501 (D.C. Cir. 2018).......................................................12, 21, 29

Kemper v. Deutsche Bank AG,
    911 F.3d 383 (7th Cir. 2018) ....................................................................27

Linde v. Arab Bank, PLC,
    882 F.3d 314 (2d Cir. 2018) ........................................................... 12, 29

Ofisi v. Al Shamal Islamic Bank,
    No. 15-2010 (JDB), 2019 WL 1255096 (D.D.C. Mar. 19, 2019) .....................22

Owens v. BNP Paribas,
    235 F. Supp. 3d 85 (D.D.C. 2017)..............................................................10

*Owens v. BNP Paribas,
    897 F.3d 266 (D.C. Cir. 2018)....................................... 1, 2, 3, 8, 15, 16, 17, 18,
                                                                    21, 23, 24, 25, 26, 27, 31

Rothstein v. UBS AG,
    708 F.3d 82 (2d. Cir. 2014) ......................................................................17

Siegel v. HSBC N. Am. Holdings, Inc.,
    933 F.3d 217 (2d Cir. 2019) ..............................................................40, 42, 43

Ungar v. Islamic Republic of Iran,
    211 F. Supp. 2d 91 (D. D. C. 2002)......................................................... 34-35

United States v. Carson,
    455 F.3d 336 (D.C. Cir. 2006)............................................................... 24-25

United States v. Chalmers,
    474 F. Supp. 2d 555 (S.D.N.Y. 2007) ..................................................... 28-29

United States v. Lopesierra-Gutierrez,
    708 F.3d 193 (D.C. Cir. 2013).................................................................37

*United States v. Saro*,
    24 F.3d 283 (D.C. Cir. 1994) ......................................................................... 36-37

**Statutes**

18 U.S.C. § 2331(1) ................................................................... 12, 23-24, 29

18 U.S.C. § 2339A ....................................................................9, 12, 28, 29

18 U.S.C. § 2339C ..............................................................................10, 28

18 U.S.C. § 2332d.....................................................................9, 12, 28, 29

18 U.S.C. § 2333 ..........................................................................1, 20, 31

28 U.S.C. § 1350.....................................................................................1

Pub. L. No. 114-222, 130 Stat. 852 (2016)...............................................20, 30, 31

**Rules**

D.C. R. Prof. Conduct 3.3(a)(3)...........................................................................22

# GLOSSARY

In accordance with D.C. Circuit Rules 28(b) and 28(a)(3), the abbreviations and acronyms used herein are defined as follows:

| | |
|---|---|
| ATA | Anti-Terrorism Act, 18 U.S.C. § 2333 |
| ATS | Alien Tort Statue, 28 U.S.C. § 1350 |
| Attacks | The August 7, 1998 attacks on the U.S. embassies in Kenya and Tanzania |
| BNPP | BNP Paribas S.A. |
| BNPP Geneva | BNP Paribas (Suisse) S.A. |
| JASTA | Justice Against Sponsors of Terrorism Act, Public Law No. 114-222 (2016) |
| June 2014 Agreements | BNP Paribas's June 2014 guilty pleas and related civil settlements concerning violations of U.S. sanctions and New York banking laws |

## COUNTERSTATEMENT OF THE ISSUES

1.     Are Plaintiffs' claims under the Alien Tort Statute ("ATS"), 28 U.S.C.
§ 1350, against BNP Paribas ("BNPP"), a French corporation, foreclosed by
the U.S. Supreme Court's decision in *Jesner v. Arab Bank, PLC*, 138 S. Ct.
1386 (2018), that there is no subject matter jurisdiction for ATS claims
brought against foreign corporations?

2.     Are Plaintiffs' claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C.
§ 2333(a), foreclosed by this Court's decision in *Owens v. BNP Paribas*, 897
F.3d 266 (D.C. Cir. 2018), that BNPP is not liable for ATA claims based on
the same underlying allegations that are made in the Complaint in this case?

3.     Did the district court properly dismiss the Complaint's common law
conspiracy and aiding and abetting claims for failure to plausibly plead the
elements set forth in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)?

## STATUTES AND REGULATIONS

Except for the authorities contained in the Addendum, all applicable statutes
are contained in the Brief for the Appellants.

## COUNTERSTATEMENT OF THE CASE

The August 7, 1998 attacks on the U.S. embassies in Kenya and Tanzania
(the "Attacks") were reprehensible.  But this Court has already ruled that BNPP is
not responsible for the Attacks.  BNPP did not commit any acts of terrorism and

did not support any terrorists.

This case presents the precise factual allegations already addressed by this Court in affirming the dismissal of ATA claims against BNPP in *Owens v. BNP Paribas*, 897 F.3d 266 (D.C. Cir. 2018).[1]  In *Owens*, this Court ruled that allegations that BNPP provided financial services to Sudan and Sudanese financial institutions in violation of U.S. sanctions were legally insufficient to establish that BNPP proximately caused the Attacks.  *Id.* at 276.  Plaintiffs now ask this Court to retread the same ground it already covered in *Owens*.  The Complaint here adds on claims under the ATS and common law, and those claims are likewise foreclosed by controlling precedent.

## I.     THE ALLEGATIONS OF THE COMPLAINT

As in *Owens*, the Complaint here is premised on an expansive and thinly alleged purported conspiracy among BNPP, Sudan, Sudanese financial institutions such as Al Shamal Islamic Bank ("Al Shamal," separately named as a defendant below), and al Qaeda.  It contends that the conspiracy sought "to defeat the economic sanctions imposed by" the United States and provided "Sudan, Sudanese financial institutions, and their agents" "[a]ccess to the U.S. financial system"

---

[1]     The Complaint here ("Compl.") was filed two weeks after the complaint in *Owens v. BNP Paribas*, No. 15-cv-1945-JDB (D.D.C. Nov. 3, 2015).  *See* JA26– 123 (Compl.) (filed Nov. 17, 2015).  Both cases were dismissed on their merits by the Honorable John D. Bates, and the *Owens* dismissal was subsequently affirmed by this Court.  897 F.3d 266 (D.C. Cir. 2018).

2

which, in turn, allowed them to "provide material support to Al Qaeda which it used to carry out" the Attacks.  JA44–45 (Compl. ¶¶ 1–2).  The Complaint concedes, however, that "BNPP did not share Al Qaeda's desire to kill American citizens and citizens of their allies."  JA45 (Compl. ¶ 3).

### A.    Allegations Based on BNPP's June 2014 Agreements

The non-conclusory allegations in the Complaint concerning BNPP's conduct are drawn entirely from BNPP's June 2014 guilty plea and related civil settlements with federal and state banking regulators addressing violations of U.S. sanctions prohibiting certain financial transactions with designated countries and Specially Designated Nationals ("SDNs") (collectively, the "June 2014 Agreements"), only a portion of which involved Sudan.  *See, e.g.*, JA48–49, 71–72, 74 (Compl. ¶¶ 9, 11–12, 106–108, 119).[2]  In the June 2014 Agreements, BNPP acknowledged that it "conspired with numerous Sudanese banks and entities as well as financial institutions outside of Sudan to violate the U.S. embargo by

---

[2]    These documents, all effective June 30, 2014, include: the Department of Justice and District Attorney for the County of New York Plea Agreement Statement of Facts ("SOF"); the New York State Department of Financial Services Consent Order ("DFS Consent Order"); the Office of Foreign Assets Control Settlement Agreement; and the Federal Reserve System Cease and Desist Order. JA126–205 (Decl. of Alexis Collins, ECF No. 13, Exhibits A–D).  The district court properly considered the contents of the June 2014 Agreements because the Complaint relies upon them in support of its primary substantive allegations regarding BNPP's conduct, and quotes from and discusses them extensively.  *See, e.g.*, JA64–69 (Compl. ¶¶ 73–99); *see also Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 273–74 (D.C. Cir. 2018) (considering June 2014 Agreements).

3

providing Sudanese banks and entities access to the U.S. financial system" from 2002 through 2007.  JA132 (SOF ¶ 17).

The Attacks, however, occurred on August 7, 1998, and the only transactions involving Sudan that are described in the June 2014 Agreements occurred years later.  Plaintiffs' allegations regarding BNPP's conduct *before* the Attacks—*i.e.*, the only conduct that even in theory could have proximately caused or substantially assisted the Attacks—rely solely on threadbare admissions contained as background facts in the June 2014 Agreements, and not any specifically pled transactions.  Those background facts demonstrate only the initial establishment of certain banking relationships between BNP Paribas (Suisse) S.A. ("BNPP Geneva")—an independent entity that is not a party to this litigation and not a BNPP branch, as Plaintiffs assert on appeal, *see* App. Br. at 6—and unnamed Sudanese banks.  Indeed, the *only* admission in the Statement of Facts from the June 2014 Agreements regarding conduct with respect to Sudan prior to the Attacks is the following (copied below in full):

> In 1997, shortly after the imposition of U.S. sanctions against Sudan, BNPP Geneva agreed to become the sole correspondent bank in Europe for Sudanese Government Bank 1, which, as noted above, was designated by OFAC as an SDN.  Sudanese Government Bank 1 then directed all major commercial banks located in Sudan to use BNPP Geneva as their primary correspondent bank in Europe.  As a result, all or nearly all major Sudanese banks had U.S. dollar accounts with BNPP Geneva.

JA133 (SOF ¶ 19); *see also* JA49 (Compl. ¶ 11(quoting SOF ¶ 19)); JA67 (Compl.

4

¶ 87). Plaintiffs also rely on similar language from a related settlement with the

New York State Department of Financial Services ("DFS"), again copied below in

full:

> Soon after the imposition of U.S. sanctions against Sudan in 1997, BNPP Geneva established account relationships with unaffiliated regional banks ("Regional Banks") located in Africa, Europe and the middle East, eventually nine in all, some with no other business purpose than to clear payments for Sudanese clients. The accounts with the Regional Banks were created and established to provide a means to circumvent U.S. sanctions.

> [ . . . ]

> As the principal foreign bank for the Government of Sudan, BNPP Geneva had an essential role in the Government of Sudan's financial stability. BNPP Geneva held accounts for a financial institution owned by the Government of Sudan since 1997 for, among other purposes, illicit U.S. dollar clearing.

JA169–70, 173 (DFS Consent Order, ¶¶ 16, 26); *see also* JA72 (Compl. ¶¶ 107–08

(quoting DFS Consent Order, ¶¶ 16, 26)).

These are the *only* admissions concerning BNPP's conduct leading up to the

Attacks on which the Complaint relies in an attempt to plead that BNPP joined a

conspiracy with Sudanese banks to "evade and defeat" sanctions against Sudan by

"conceal[ing] and hid[ing] the ownership, control, and interest of the Sudanese

government and Sudanese banks" in order to "enable Sudan access to the . . . U.S.

financial markets and to avoid blocking of Sudanese funds within the United

States." JA72 (Compl. ¶ 108).

Critically, none of these limited admissions provides a basis for the

5

Complaint's conclusory assertion that BNPP engaged in transactions with Sudan or Sudanese banks that funded or were otherwise involved in the Attacks during this period.  Nor do any of these limited admissions connect BNPP to any terrorist, terrorist organization or terrorist activity, or show that BNPP provided any support to or funds for any terrorist organization or terrorist activity, let alone for the Attacks.

### B. Conclusory Allegations Regarding BNPP's Purported Connections to Sudan, Al Shamal Bank and al Qaeda

The Complaint attempts to use the limited admissions about BNPP's conduct predating the Attacks from the June 2014 Agreements as a springboard to show connections between BNPP and other members of the purported conspiracy in that time period.  However, no facts are pled in support of these attempted connections.

First, the Complaint alleges that BNPP transacted with the Sudanese government, which in turn sponsored terrorist groups and was named a State Sponsor of Terrorism by the U.S. Department of State in 1993.  JA65–66, 77–83 (Compl. ¶¶ 80–82, 126–53).  However, the Complaint contains no non-conclusory allegations as to how the Sudanese government purportedly financed terrorist groups.  Rather, it contains only conclusory assertions, such as that Sudan provided "financial and banking services for [al Qaeda's] terrorist network," JA83 (Compl. ¶ 151).  The Complaint pleads no facts connecting BNPP to these services.

6

Second, the Complaint alleges, without identifying any factual basis, that "BNPP processed transaction [sic] on behalf of Al Shamal, the proceeds of which were delivered to Al Qaeda for operations, including for planning and perpetrating" the Attacks. JA86 (Compl. ¶ 167). No facts are pled to support this conclusion. Moreover, notwithstanding the Complaint's conclusory allegations that BNPP knew of Al Shamal's connections to al Qaeda "from at least November 1997," JA101 (Compl. ¶ 233), only *one* of the sources that the Complaint cites regarding Al Shamal's alleged connection to al Qaeda was published before the Attacks, and the Complaint does not allege that BNPP was aware of that report, *see* JA84 (Compl. ¶ 158). Elsewhere, the Complaint repeatedly refers to "public reporting of [Al Shamal's] ties to Al Qaeda *following* the 1998 East African Embassy Attacks." JA53 (Compl. ¶ 26) (emphasis added).

Critically, the Complaint does not identify a single banking transaction processed by BNPP that allegedly was part of Sudan's or Al Shamal's transfer of funds to any terrorist organization at any time, let alone before the Attacks. Nor does the Complaint allege that the "financial and banking services" Sudan or Al Shamal purportedly provided to al Qaeda were provided in U.S. dollars. *See* JA82–84 (Compl. ¶¶ 151, 156).[3] And the Complaint lacks any well-pled

---

[3]     The Complaint alleges that "[w]ith funds (in U.S. dollars) drawn from Al Shamal, Al Qaeda purchased several farms throughout Sudan." JA78 (Compl. ¶ 127). However, there is no allegation as to when this occurred or whether the

allegations that, in processing U.S. dollar-denominated transactions for Sudanese banks, BNPP transferred money for any segment of the Sudanese government that allegedly funded al Qaeda, much less that BNPP processed transactions directly for al Qaeda or any other terrorist entity.  *See Owens*, 897 F.3d at 276 (in relying on the Statement of Facts filed among the June 2014 Agreements, "Plaintiffs' complaint fail[ed] to plausibly allege that any currency processed by BNPP for Sudan was either in fact sent to al Qaeda or necessary for Sudan to fund the embassy bombings.").

At bottom, the Complaint lacks any well-pled allegations sufficient to support the conclusion that BNPP's processing of U.S. dollar-denominated transactions for sanctioned Sudanese banks were in any way connected to, let alone a significant factor in, the Attacks.  Instead, the Complaint repeats conclusory allegations that BNPP's violations of U.S. sanctions facilitated al Qaeda's perpetration of the Attacks, JA44–45 (Compl. ¶¶ 1–3).  But instead of pleading facts linking BNPP to the Attacks, the Complaint just asserts legal conclusions; for example, that the Attacks were "directly and proximately caused by BNPP's knowing and intentional participation in a conspiracy to help Sudan and Sudanese financial institutions defeat U.S. economic sanctions explicitly designed to stop Al

---

dollars were cleared through BNPP.  Nor does the Complaint link this purchase to the Attacks.

Qaeda," JA45 (Compl. ¶ 3); that al Qaeda relied on BNPP's banking services "in carrying out" the Attacks, JA49 (Compl. ¶ 13); that if BNPP had fully complied with U.S. law, its cooperation would have "assisted the U.S. Government and allied nations [to] detect, disrupt, and prevent" the Attacks, JA62 (Compl. ¶ 62); and that the transactions BNPP facilitated on behalf of Sudanese banks "made it more likely for sponsors of terrorism and terrorist organizations, such as Sudan, Al Shamal and Al Qaeda to prosper[,]" JA101 (Compl. ¶ 231). None of these allegations states any facts that connect any of BNPP's U.S. dollar-clearing transactions to the Attacks, or indeed, to any terrorist organizations in Sudan or elsewhere.

## II.    THE DISTRICT COURT'S RULINGS

### A.    Motion to Dismiss Decision

On September 29, 2017, the district court granted BNPP's motion to dismiss the Complaint in full. *See* JA222 (*Ofisi v BNP Paribas*, No. 15-cv-02010-JDB (D.C.C. Sept. 29, 2017), ECF No. 30). As pertinent to this appeal, the district court held that the Complaint failed to: (1) satisfy the proximate causation element of a primary liability ATA claim; (2) allege violations of 18 U.S.C. §§ 2339A and 2332d, upon which the Complaint relied to establish a "predicate criminal violation" underlying the "act of international terrorism" element of Plaintiffs'

primary liability ATA claim;[4] (3) sufficiently plead the elements of an aiding and abetting claim against BNPP under the ATS; or (4) sufficiently plead common law conspiracy or common law aiding and abetting liability under *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). *See* JA223–257 (the "MTD Decision").[5]

In evaluating the ATA's proximate causation element, the district court repeatedly referred back to its decision dismissing the "similar" ATA complaint in *Owens v. BNP Paribas*, 235 F. Supp. 3d 85 (D.D.C. 2017), which at the time was pending on appeal:

> As this Court recognized when analyzing similar allegations in *Owens*, the fact that money was transferred to or for a state sponsor of terrorism makes it more likely that the money was used for terrorism than if the transfers had been to a state that does not sponsor of terrorism. But the fact remains that Sudan is a government, and as such it has many legitimate agencies, operations, and programs to fund. Processing funds for Sudan or Sudanese commercial banks is not the same as processing funds for a terrorist organization or a terrorist front.

JA240 (MTD Decision at 18 (quoting *Owens*, 235 F. Supp. 3d at 99 and *Rothstein*

---

[4]    The Complaint also alleged a predicate criminal violation of 18 U.S.C. § 2339C, which the district court correctly rejected because § 2339C was enacted after the Attacks and does not apply retroactively. JA232 (MTD Decision at 10). Plaintiffs do not challenge this aspect of the district court's ruling.

[5]    Other aspects of the district court's ruling that Plaintiffs have not challenged on appeal are its ruling that they cannot assert secondary liability claims under the ATA, JA233 (MTD Decision at 11), and the court's dismissal of the Complaint's claims for tortious interference with prospective economic advantage, JA255–56 (MTD Decision at 33–34), and punitive damages, JA256 (MTD Decision at 34).

*v. UBS AG*, 708 F.3d 82, 97 (2d. Cir. 2014)) (internal quotations and citations omitted)).

The district court also noted that "most of the facts alleged with respect to BNPP's conduct post-date the embassy bombings," since "the detailed factual allegations concerning BNPP's violation of U.S. sanctions against Sudan involve BNPP's conduct between 2002—four years after the embassy bombings—and 2012." JA237 (MTD Decision at 15). The court characterized Plaintiffs' bare allegation that "BNPP processed transaction[s] on behalf of Al Shamal, the proceeds of which were delivered to al Qaeda for . . . planning and perpetrating the embassy bombings," as "a naked assertion devoid of factual support" that "need not be accepted by the Court." JA239 (MTD Decision at 17).

The district court accordingly concluded that "there is simply not enough to sustain a sufficiently direct causal connection between BNPP's conduct and the embassy bombings," noting that, as in *Owens*:

> [P]laintiffs have made no detailed factual allegations showing, for example, that BNPP participated in the attacks or provided money directly to any terrorist group, that any money BNPP processed for Sudan or Sudanese banks was transferred to al Qaeda prior to the attacks, or that Sudan would have been unable to assist al Qaeda without the funds that BNPP processed.

JA241 (MTD Decision at 19).

The district court also concluded that the Complaint's ATA claims failed for the additional and independent reason that the Complaint failed to sufficiently

allege predicate criminal violations of §§ 2339A and 2332d.[6]  With respect to

§ 2339A, the district court again relied on its prior ruling in *Owens* to conclude that

the Complaint failed to satisfy the statute's scienter element because it did not

"allege sufficient facts to show either that (1) BNPP knew Sudan or Al Shamal was

acting as an agent of al Qaeda or of an individual terrorist or (2) BNPP knew the

ultimate beneficiaries of the financial services would be a terrorist organization or

terrorist."  JA237–238 (MTD Decision at 15–16 (quoting *Owens*, 235 F. Supp. 3d

at 98–99) (internal quotations omitted)).  As to § 2332d, the district court

concluded correctly that the plain text of the statute does not apply to foreign

entities such as BNPP.  JA234–36 (MTD Decision at 12–14).

In addressing Plaintiffs' ATS claims, the district court concluded that

"plaintiffs' allegations are insufficient to establish either the actus reus or mens rea

elements of aiding and abetting liability under customary international law."

---

[6]    The district court assumed that a violation of either statute could satisfy the
ATA's requirement that the defendant commit an "act of international terrorism."
*See* JA231 (MTD Decision at 9).  This Court later clarified in *Kaplan v. Cent.
Bank of the Islamic Republic of Iran* that ATA plaintiffs must also establish the
definitional elements of "international terrorism" set out in 18 U.S.C. § 2331(1).
896 F.3d 501, 512 (D.C. Cir. 2018) ("An act qualifies as 'international terrorism'
only if it violates a domestic criminal law (either state or federal) and intends to
coerce a civilian population, influence government policy, or affect government
conduct." (quoting § 2331(1))); *see also Linde v. Arab Bank, PLC*, 882 F.3d 314,
326 (2d Cir. 2018) ("[T]he court was required to charge, and the jury obliged to
find proved, the definitional requirements of § 2331(1) to find [defendant] liable as
a principal under § 2333(a).").

JA251 (MTD Decision at 29). As noted above, the Supreme Court subsequently ruled in *Jesner v. Arab Bank, PLC* "that foreign corporations may not be defendants in suits brought under the ATS." 138 S. Ct. 1386, 1407 (2018).

As to Plaintiffs' common law conspiracy claims, the district court analyzed the elements laid out in *Halberstam*, 705 F.2d at 477, and concluded that "Plaintiffs fail to plead that BNPP acted in furtherance of a 'common scheme' with al Qaeda to cause tortious harm to plaintiffs"; and moreover that "there is no private right of action for sanctions violations," and "[t]he complaint does not plausibly allege that BNPP knew of the existence of any conspiracy between Sudan and al Qaeda to carry out the embassy bombings." JA253–54 (MTD Decision at 31–32).

The district court likewise applied the *Halberstam* elements of common law aiding and abetting and held that "plaintiffs have not sufficiently pled that BNPP knowingly or substantially assisted the terrorist attacks on the U.S. embassies" and indeed that "there are no well-pleaded allegations that BNPP provided any funding, directly or indirectly, to al Qaeda that was used to carry out the attacks." JA254 (MTD Decision at 32).

Because the district court dismissed all the claims against BNPP on their merits, it did not reach BNPP's arguments that all of the Complaint's claims are also time-barred. JA256 (MTD Decision at 34 n.25).

13

**B.      Reconsideration Decision**

On January 11, 2018, the district court issued an order denying Plaintiffs'

motion for reconsideration.  *See* JA258.  In its accompanying Memorandum

Opinion, JA259–269 ("Reconsideration Decision"), the district court reaffirmed its

rulings in its September 29, 2017 Memorandum Order granting BNPP's Motion to

Dismiss.

The court rejected Plaintiffs' assertions that it failed to "consider their well-

pled factual allegations concerning BNPP's conduct prior to the August 1998

terrorist attacks," and reiterated that such allegations were insufficient "because

plaintiffs did not plausibly allege that BNPP knew that Sudan or any Sudanese

bank was acting as an agent of al Qaeda or any terrorist, or that the ultimate

beneficiaries of any financial services provided would be a terrorist organization."

JA263 (Reconsideration Decision at 5).  Moreover, "[e]ven accepting that BNPP

was fully aware of Sudan's activities as a state sponsor of terrorism prior to 1997

. . . Plaintiffs simply cannot equate the transfer of money to Sudan with the transfer

of money to al Qaeda."  *Id.* (citing *Owens v. BNP Paribas*, 235 F. Supp. 3d 85, 99

(D.D.C. 2017)).

The district court also rejected Plaintiffs' attempts to relitigate their common

law claims, explaining that in contrast to *Halberstam*, where the "partner had

actual knowledge of the ongoing tortious activity of her companion and she

provided substantial assistance to directly further the continued success of the illicit burglary scheme," the Complaint here "failed to plausibly allege that BNPP directly funded any terrorist group, had knowledge of Sudan's use of BNPP-provided funds to sponsor terrorist activities, or knew that BNPP's conduct actually enabled the attacks."  JA267 (Reconsideration Decision at 9 (citing *Halberstam*, 705 F.2d at 486)).

### C.    Subsequent Procedural History

Following its initial dismissal of the Complaint's claims against Al Shamal for failure to effect service, the district court permitted Plaintiffs to pursue their claims against Al Shamal after BNPP's dismissal from the action.  JA278 (Reconsideration Decision at 8).  Plaintiffs voluntarily dismissed their claims against Al Shamal in 2022 after entering into a settlement with the U.S. government and Sudan to resolve their claims arising from the Attacks.  *See* App. Br. at 2, n.1.

## III.    THIS COURT'S *OWENS V. BNP PARIBAS* DECISION

On July 27, 2018—following the district court's dismissal of the claims against BNPP in this case (and denial of Plaintiffs' reconsideration motion)—this Court affirmed the district court's judgment in *Owens v. BNP Paribas, S.A*, which dismissed substantially similar allegations against BNPP for failure to satisfy the ATA's proximate causation requirement.  897 F.3d 266 (D.C. Cir. 2018).

Like here, the complaint in *Owens* relied "almost entirely" on BNPP's June 2014 Agreements, and alleged, among other things, that BNPP "moved large amounts of money throughout the U.S. financial system on behalf of Sudan and al Qaeda between 1997 up to and including August 7, 1998, the date of the embassy bombings." *Owens*, 897 F.3d at 274 (internal quotations omitted). While accepting as true the complaint's well-pleaded allegations, this Court also noted that it need not "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice"—here, the June 2014 Agreements. *Id.* at 272–73 (internal quotations omitted). This Court accordingly closely scrutinized the *Owens* complaint against the June 2014 Agreements, noting that "[m]ost of the facts to which BNPP stipulated in federal court involved conduct after the embassy bombings, which have no bearing on what actions 'caused' the bombings," and rejected plaintiffs' efforts to "rely on a blatant misinterpretation of BNPP's stipulations." *Id.* at 274. While construing all reasonable inferences in favor of plaintiffs to accept that the complaint sufficiently alleged "that the banking relationship between BNPP and Sudan that developed before the bombings involved some form of financial services, including BNPP's processing of funds for Sudan," this Court concluded that such allegations fell short of establishing proximate causation under the ATA. *Id.* at 275.

16

Instead, this Court concluded that the district court had properly applied the Second Circuit's reasoning in *Rothstein v. UBS AG*, 708 F.3d 82 (2d Cir. 2013). *Rothstein* "correctly recognized when a defendant is more than one step removed from a terrorist act or organization, plaintiffs suing under the ATA must allege some facts demonstrating a substantial connection between the defendant and terrorism," and that "when an intermediary is a sovereign state with many legitimate agencies, operations, and programs to fund, the need for additional allegations supporting substantiality is all the more acute." *Owens*, 897 F.3d at 275 (internal quotation omitted). Indeed, "[i]f Congress intended that 'any provider of U.S. currency to a state sponsor of terrorism would be strictly liable for injuries subsequently caused by a terrorist organization associated with that state,' it would have done so explicitly." *Id.* at 276 (quoting *Rothstein*, 708 F.3d at 96).

Ultimately, this Court affirmed the dismissal of the *Owens* complaint because there was "no nonconclusory allegation in the Complaint that plausibly shows that the moneys [BNPP] transferred to [Sudan] were in fact sent to [al Qaeda] or that [Sudan] would have been unable to fund the attacks by [al Qaeda] without the cash provided by [BNPP]." *Id.* at 276 (quoting *Rothstein*, 708 F.3d at 97) (alterations in original).

## SUMMARY OF THE ARGUMENT

Plaintiffs' statutory claims under the ATA and ATS are squarely foreclosed by controlling precedent from this Court and the U.S. Supreme Court, which Plaintiffs ignore.  Plaintiffs' fallback common law claims are also not viable, as the district court correctly found.  The decision below should be affirmed.

*First*, Plaintiffs' appeal of the dismissal of their ATS claims is frivolous.  In *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1407 (2018)—decided after the district court's decision below—the Supreme Court held that district courts lack subject matter jurisdiction over ATS claims brought against foreign corporations such as BNPP.  138 S. Ct. at 1407.  Plaintiffs do not even mention *Jesner*, much less explain how their ATS claims against BNPP can be sustained in light of that decision.  Nor can they.

*Second*, Plaintiffs' appeal of the dismissal of their ATA claims fails given this Court's decision in *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018).  In that case, this Court ruled that allegations that BNPP processed financial transactions for Sudanese entities in violation of U.S. sanctions—identical in all material respects to the allegations in this case—were insufficient to establish that BNPP proximately caused the Attacks as required by the ATA.  *Owens* is directly on point and controlling precedent.  Plaintiffs' brief footnote-reference to *Owens* fails to offer a single factual basis to distinguish their claims there from their

copycat Complaint here. *See* App. Br. at 40–41, n.12. In any event, although *Owens* did not need to reach this issue, the Complaint also independently fails to satisfy the ATA's separate "act of international terrorism" element.

*Third*, the Complaint's fallback common law claims are also not viable. As the plurality instructed in *Jesner*, "[t]he Anti-Terrorism Act . . . is part of a comprehensive statutory and regulatory regime that prohibits terrorism and terrorism financing. . . . It would be inappropriate for courts to displace this considered statutory and regulatory structure by holding banks subject to common-law liability." 138 S. Ct. at 1405. Plaintiffs should not be permitted to bypass the comprehensive scheme for civil liability for terrorism set out by Congress under the ATA and JASTA by asserting broader claims under common law than they are permitted to bring under either statute.

As to the merits of the common law claims, the district court correctly concluded that the Complaint fails to establish the elements for conspiracy and aiding and abetting liability laid out in *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983). Courts analyzing secondary liability for terrorism against banks that violated U.S. sanctions have consistently found that allegations that a bank provided funds to a sovereign state or intermediary commercial banks are too attenuated to give rise to conspiracy or aiding and abetting liability, without some more direct connection between the terrorists responsible for the attack at issue and

19

the defendant bank.  Most recently, this Court held in *Bernhardt v. Islamic Republic of Iran* that HSBC's violation of U.S. sanctions on Iran did not make it liable on either a conspiracy or aiding and abetting theory of liability for a terrorist attack by al Qaeda.[7]  47 F.4th 856, 866 (D.C. Cir. 2022), *petition for reh'g pending*, No. 21-7018 (filed Oct. 6, 2022).  *Bernhardt* confirms that the district court correctly applied *Halberstam* to dismiss the Complaint's secondary liability claims here.

For all these reasons, the district court's ruling should be affirmed.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's order granting BNPP's motion to dismiss.  *Bernhardt*, 47 F.4th at 866.  The standard for reviewing a motion to dismiss is well established.  A "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A complaint can establish a facially plausible claim only if it sets forth 'factual content that allows the court to draw the reasonable

---

[7]     The claims in *Bernhardt* were brought under the 2016 Justice Against Sponsors of Terrorism Act ("JASTA"), 18 U.S.C. § 2333(d), which provides for common law aiding-and-abetting and conspiracy liability under the ATA for certain acts of international terrorism.  This Court applied the common law framework for secondary liability set out in *Halberstam* to the JASTA claims in *Bernhardt* per the instructions in JASTA's Findings and Purpose.  *See Bernhardt*, 47 F.4th at 867.

inference that the defendant is liable for the misconduct alleged.'"  *Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 272 (D.C. Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678). The Court "need not accept inferences unsupported by facts or legal conclusions cast in the form of factual allegations," or "accept as true the complaint's factual allegations insofar as they contradict exhibits to the complaint or matters subject to judicial notice."  *Id.* at 272–73 (internal quotations and citations omitted).

## ARGUMENT

## I.    THE SUPREME COURT'S RULING IN *JESNER V. ARAB BANK* FORECLOSES PLAINTIFFS' ATS CLAIMS

Plaintiffs burden the Court with a frivolous appeal of the dismissal of their ATS claims.  At the time the district court decided BNPP's motion to dismiss, the law in this Circuit permitted plaintiffs to pursue ATS claims against foreign corporations.  *See, e.g.*, *Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 514–15 (D.C. Cir. 2018) (noting change in law).  However, subsequent to the decision below, the Supreme Court ruled in *Jesner* "that foreign corporations may not be defendants in suits brought under the ATS."  138 S. Ct. at 1407.  In so ruling, the *Jesner* plurality explained:

> The detailed regulatory structures prescribed by Congress and the federal agencies charged with oversight of financial institutions reflect the careful deliberation of the political branches on when, and how, banks should be held liable for the financing of terrorism.  It would be inappropriate for courts to displace this considered statutory and regulatory structure by holding banks subject to common-law liability in actions filed under the ATS.

21

*Id.* at 1405.

Plaintiffs fail to even cite *Jesner*, despite their ethical obligation to inform this Court of adverse controlling authority.  *See* D.C. R. Prof. Conduct 3.3(a)(3); App. Br. 39–40.  Notably, while the Supreme Court issued its decision in *Jesner* after the district court decided BNPP's motion to dismiss (and dismissed the ATS claim on other grounds), the district court had the benefit of *Jesner* in deciding co-defendant Al Shamal's later motion to dismiss—and at that time, Plaintiffs conceded that *Jesner* foreclosed their ATS claims against Al Shamal.  *See Ofisi v. Al Shamal Islamic Bank*, No. 15-2010 (JDB), 2019 WL 1255096, at *9 (D.D.C. Mar. 19, 2019).  Plaintiffs cannot claim ignorance that their identical claims against BNPP are likewise foreclosed.

Like the defendant bank in *Jesner*, BNPP is a multinational bank that operates branches in the United States but is incorporated and headquartered abroad.  *See Jesner*, 138 S. Ct. at 1394; JA51 (Compl. ¶ 18) ("BNPP is a French multinational bank, incorporated under the laws of France, and headquartered in Paris, France.").  Accordingly, *Jesner* controls here: the Court has no subject-matter jurisdiction to hear the ATS claims against BNPP.  The district court's dismissal of those claims should be affirmed.

22

## II.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF UNDER THE ATA

### A.    *Owens v. BNP Paribas* Forecloses Plaintiffs' Proximate Causation Arguments

Just as Plaintiffs ignore *Jesner* in the context of their ATS claims, they also relegate this Court's directly on point precedent, *Owens v. BNP Paribas, S.A.*, 897 F.3d 266 (D.C. Cir. 2018) to a cursory footnote, instead citing outdated and out-of-circuit caselaw in an ineffective attempt to rescue their ATA claims.  *See* App. Br. at 40–41, n.12; *id.* 41–44.

To assert a primary liability claim under the ATA, the Complaint must adequately plead three elements: "First, a U.S. national must have suffered an injury.  Second, there must have been an act of international terrorism.  And third, the U.S. national's injury must have occurred 'by reason of' the act of international terrorism."  *Owens*, 897 F.3d at 270.  "International terrorism" is defined as activities that:

> (A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
> (B) appear to be intended—
>> (i) to intimidate or coerce a civilian population;
>> (ii) to influence the policy of a government by intimidation or coercion; or
>> (iii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
> (C) occur primarily outside the territorial jurisdiction of the United States.

18 U.S.C. § 2331(1). The ATA's "by reason of" language also "demands a showing of proximate causation." *Owens,* 897 F.3d at 273.

This Court held in *Owens* that allegations that BNPP provided financial services to Sudan and Sudanese financial institutions in violation of U.S. sanctions failed to satisfy the ATA's proximate causation requirement. *Owens*, 897 F.3d at 276. Carefully parsing the *Owens* plaintiffs' complaint, which was predicated on the same June 2014 Agreements as the Complaint in this action, the Court could "see no nonconclusory allegation in the Complaint that plausibly shows that the moneys [BNPP] transferred to [Sudan] were in fact sent to [al Qaeda] or that [Sudan] would have been unable to fund the attacks by [al Qaeda] without the cash provided by [BNPP]." *Id.* (quoting *Rothstein v. UBS AG*, 708 F.3d 82, 97 (2d Cir. 2013)) (alterations in original). The district court here properly dismissed the Complaint below for the exact same reason:

> [P]laintiffs have made no detailed factual allegations showing, for example, that BNPP participated in the attacks or provided money directly to any terrorist group, that any money BNPP processed for Sudan or Sudanese banks was transferred to al Qaeda prior to the attacks, or that Sudan would have been unable to assist al Qaeda without the funds that BNPP processed.

JA241 (MTD Decision at 19). This Court's construction of the ATA's "by reason of" requirement in *Owens* is binding law of the Circuit and controls in this case. *See United States v. Carson*, 455 F.3d 336, 384 n.43 (D.C. Cir. 2006) ("[W]e are, of course, bound to follow circuit precedent absent contrary authority from an en

banc court or the Supreme Court.").

    Plaintiffs here have not even tried to distinguish *Owens*, and merely assert, in a footnote and without elaboration, that they "set forth specific and actionable facts materially different and beyond the factual allegations set forth in *Owens*." App. Br. at 40–41, n.12.  Nor could they distinguish *Owens*: the two complaints involve the same Attacks and same underlying theory of liability, and each are based on (and draw a number of unreasonable inferences from) the same June 2014 Agreements.  In *Owens*, this Court recognized that it need not accept as true speculative allegations that contradict the June 2014 Agreements, 897 F.3d at 274, nor conclusory legal assertions that "Sudanese banks transmitted the funds from BNPP directly to al Qaeda, and that these funds from BNPP were necessary for al Qaeda to carry out the embassy bombings," *id.* at 276.  The Complaint here offers more of the same types of allegations, and the district court properly rejected them. *See, e.g.*, JA239 (MTD Decision at 17) ("[P]laintiffs' allegation that 'upon information and belief, BNPP processed transaction[s] on behalf of Al Shamal, the proceeds of which were delivered to al Qaeda for . . . planning and perpetrating the embassy bombings,' is a naked assertion devoid of factual support, and need not be accepted by the Court." (internal citation omitted)).

    Plaintiffs—just like the plaintiffs in *Owens*—focus their appeal on inferences drawn from the June 2014 Agreements regarding BNPP's relationships

with Sudanese institutions prior to the Attacks.  *See* App. Br. at 5–7.  But Plaintiffs overlook that this Court in *Owens* accepted the inference that "the banking relationship between BNPP and Sudan that developed before the bombings involved some form of financial services, including BNPP's processing of funds for Sudan," and still concluded that such allegations were insufficient to establish that the alleged  "conduct was a 'substantial factor' in producing Plaintiffs' injuries," as required to establish proximate causation.  897 F.3d at 275.

In a last-ditch effort to rescue their ATA claims, Plaintiffs invoke the argument that "money is fungible,"[8] without acknowledging that this theory has been *repeatedly* rejected by this Court in this context.  *See Bernhardt*, 47 F.4th at 865 ("Pleading Iran's involvement does not support an inference that Bernhardt's injuries sufficiently related to HSBC's conduct because aid to Iran could just as plausibly benefit its otherwise legitimate operations rather than al-Qaeda."); *Atchley v. Astrazeneca UK Ltd.*, 22 F.4th 204, 227–28 (D.C. Cir. 2022) ("A sovereign state has 'many legitimate agencies, operations, and programs to fund' so, even if the state is known to prop up terrorists, we cannot presume that aid to such a state finds its way into terrorist hands." (quoting *Owens*, 897 F.3d at 276)).  As the district court recognized in dismissing this case, and this Court recognized

---

[8]     *See* App. Br. at 42 (arguing that "[m]oney is fungible; by providing money to Sudan (an active participant in terrorist activities), BNPP freed up other funds to be used for terrorist activities.").

in *Owens*:

> [W]hen an intermediary is a sovereign state with 'many legitimate agencies, operations, and programs to fund,' the need for additional allegations supporting substantiality is all the more acute. . . . If Congress intended that 'any provider of U.S. currency to a state sponsor of terrorism would be strictly liable for injuries subsequently caused by a terrorist organization associated with that state,' it would have done so explicitly.

*Owens*, 897 F.3d at 276 (quoting *Rothstein*, 708 F.3d at 96–97).  While Plaintiffs seek to rely on *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685, 698 (7th Cir. 2008), for their fungibility theory, App. Br. at 42, that case must be read along with other Seventh Circuit precedent, in particular *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018).  In *Kemper*, the Seventh Circuit, citing this Court's decision in *Owens*, explained that "[w]hen one of the links on a causal chain is a sovereign state, the need for facts specifically connecting a defendant's actions to the ultimate terrorist attack is especially acute."  911 F.3d at 393 (citing *Owens*, 897 F.3d at 276).  No such facts connecting BNPP with the Attacks at issue here are alleged in the Complaint.

## B. The Complaint Independently Fails to Satisfy the ATA's Act of International Terrorism Element

This Court's decision in *Owens* is sufficient to dispose of Plaintiffs' ATA claims.  But the district court also correctly held that Plaintiffs failed to sufficiently allege a predicate criminal act as required by the ATA's "act of international terrorism" element, a failure that independently forecloses their ATA claims.  *See*

JA232, JA234–41 (MTD Decision at 10, 12–19) (analyzing and rejecting Plaintiffs' assertions under 18 U.S.C. §§ 2339C, 2332d, and 2339A).  The district court correctly concluded that the Complaint failed to plead that BNPP had the requisite scienter under 18 U.S.C. § 2339A because the Complaint did not "allege sufficient facts to show either that '(1) BNPP knew Sudan or Al Shamal was acting as an agent of al Qaeda or of an individual terrorist or (2) BNPP knew the ultimate beneficiaries of the financial services would be a terrorist organization or terrorist.'"  JA237–238 (MTD Decision at 15–16) (quoting *Owens*, 235 F. Supp. 3d at 98–99) (cleaned up).  The court noted that the Complaint does not contain any detailed factual allegations that BNPP knew about "[Al Shamal's] supposed connections to al Qaeda," and "[n]otwithstanding several conclusory allegations" that BNPP knew of Al Shamal's alleged connections to Al Qaeda prior to the Attacks, "it appears that the relationship between Al Shamal and Bin Laden was not widely reported until *after* the 1998 embassy bombings."  JA238 (MTD Decision at 16) (emphasis in original).

Similarly, the district court correctly held that BNPP, which is incorporated and headquartered in France, is not a "United States person" within the meaning of 18 U.S.C. § 2332d.  JA234–36 (MTD Decision at 12–14).  That BNPP admitted to processing certain transactions through its branch office in the United States does not render BNPP a "United States Person."  *See United States v. Chalmers*, 474 F.

Supp. 2d 555, 565 (S.D.N.Y. 2007) (considering and rejecting claim that foreign company "qualifie[d] as 'a United States person' because it conducted its alleged criminal activity 'in the United States.'").  Plaintiffs cite no caselaw supporting their contrary interpretation of § 2332d, instead citing to a wholly inapposite decision interpreting the personal jurisdiction rules of the state of New York.  App. Br. at 47 (citing *Koehler v. Bank of Bermuda Ltd.*, 12 N.Y.3d 533, 536 (2009)).

Furthermore, even if the Complaint properly pleaded violations of either §§ 2339A or 2332d, it would still fail to establish the full definition of international terrorism in § 2331(1).  *See Kaplan v. Cent. Bank of the Islamic Republic of Iran*, 896 F.3d 501, 512 (D.C. Cir. 2018) ("An act qualifies as 'international terrorism' only if it violates a domestic criminal law (either state or federal) and intends to coerce a civilian population, influence government policy, or affect government conduct." (citing § 2331(1))); *Linde v. Arab Bank, PLC*, 882 F.3d 314, 326 (2d Cir. 2018) ("[T]o qualify as international terrorism, a defendant's act must *also* involve violence or endanger human life.  Further, the act must appear to be intended to intimidate or coerce a civilian population or to influence or affect a government." (citing § 2331(1)) (emphasis in original)); JA253 (MTD Decision at 31) ("[T]he complaint acknowledges that 'BNPP did not share al Qaeda's desire to kill American citizens and citizens of their allies.'").

Accordingly, the district court properly dismissed the Complaint's ATA

claims.

## III.  THE DISTRICT COURT CORRECTLY HELD THAT PLAINTIFFS FAIL TO STATE COMMON LAW SECONDARY LIABILITY CLAIMS

### A.  Plaintiffs Should Not Be Permitted to End Run JASTA's Limitations Via Recourse to "Federal Common Law"

At the threshold, the ATA and JASTA comprise a detailed and comprehensive statutory scheme for civil liability for acts of international terrorism which does not extend to Plaintiffs' secondary liability claims in this case. Plaintiffs should not be allowed to bypass this comprehensive scheme and express limitations on liability set out by Congress by asserting broader claims under common law than they are permitted to bring under the ATA and JASTA.  *See* App. Br. at 1 (invoking federal common law).[9]

Plaintiffs here are barred from pursuing ATA secondary liability claims under JASTA for multiple reasons.  First, JASTA only applies to attacks that

---

[9]    In its motion to dismiss below, BNPP contested whether Plaintiffs' common law secondary liability claims were cognizable, noting that "[t]he ATA was designed to provide "a new 'civil legal cause of action'" for material support of terrorism.  *See* Mem. L. of Def. BNP Paribas S.A. in Supp. Mot. to Dismiss Compl. 39–40, ECF No. 13 (quoting H.R. Rep. No. 102-1040, at *4–*5 (1992)). While the district court reached the merits of Plaintiffs' common law claims, *see* JA253–54 (MTD Decision at 31–32) (assuming D.C. common law applied), the *Jesner* plurality has since clarified the limits of common law liability for terrorist conduct, *see Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1405 (2018).  This Court "can affirm a district court judgment on any basis supported by the record." *Carney v. Am. Univ.*, 151 F.3d 1090, 1096 (D.C. Cir. 1998).

occurred after September 2001, and Plaintiffs here were injured in 1998. *See Owens v. BNP Paribas, S.A.*, 897 F.3d 266, 277 (D.C. Cir. 2018). Second, JASTA requires that the attack at issue be "committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization," as of the date of the attack, 18 U.S.C. § 2333(d)(2), and al Qaeda was not designated until 1999, a year after the Attacks.[10]

Despite these multiple bars to pursuing JASTA claims, Plaintiffs rely on this Court's JASTA precedent to establish their common law claims, essentially seeking to bypass the carefully considered limits Congress has placed on international terrorism suits.[11] *See, e.g.*, App. Br. at 25, 32. The Supreme Court has noted that "[f]oreign policy and national security decisions are 'delicate, complex, and involve large elements of prophecy' for which 'the Judiciary has neither aptitude, facilities[,] nor responsibility.'" *Hernandez v. Mesa*, 140 S. Ct. 735, 749 (2020) (quoting *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1414 (2018) (Gorsuch, J., concurring in part and concurring in judgment)). The plurality in

---

[10]    *See* U.S. Dep't of State, Foreign Terrorist Organizations, https://www.state.gov/foreign-terrorist-organizations/ (last visited Nov. 30, 2022).

[11]    Congress's instruction in JASTA's Findings and Purpose that it intended to provide "the broadest possible basis" for relief against terrorism must be read together with the plain text of the statute, which sets clear limits on which acts may provide a basis for relief under JASTA. *See* JASTA, Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016).

*Jesner* accordingly found that common law claims under the ATS should not be available for claims covered by the ATA. *Jesner* instructed that "[i]t would be inappropriate for courts to displace this considered statutory and regulatory structure [under the ATA] by holding banks subject to common-law liability." 138 S. Ct. at 1405. The federal regulatory framework for international terrorism similarly displaces common law liability in this case. *See American Ins. Assn. v. Garamendi*, 539 U.S. 396, 413 (2003) ("There is, of course, no question that at some point an exercise of state power that touches on foreign relations must yield to the National Government's policy"); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 377 (2000) (Massachusetts state law that sought to impose economic sanctions on Burma was pre-empted because it posed an obstacle to the goals of a federal statute imposing a different set of economic sanctions on Burma).

Finally, the Complaint's common law claims fail on their merits.[12] As with Plaintiffs' statutory claims, new precedent in the years since the dismissal of the claims below further confirms that the district court correctly dismissed these

---

[12]    Such claims could only be brought by the remaining U.S. national plaintiffs, as the Court has no subject-matter jurisdiction to hear the foreign plaintiffs' ATS claims, and those same plaintiffs cannot establish diversity jurisdiction to bring common law claims against BNPP. *See Abur v. Republic of Sudan*, 437 F. Supp. 2d 166, 169 n.4 (D.D.C. 2006) (there is "no alien-alien diversity jurisdiction"); *see also Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1263 (D.C. Cir. 1995) ("After the district court dismissed the federal claims . . . it abused its discretion by reaching the merits of the local-law claims.").

claims in the first instance because Plaintiffs' attempted analogies to *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir. 1983)—the case that provides the governing standard for secondary liability claims—were simply "off the mark." JA254 (MTD Decision at 32, n.23).

As the district court noted, the secondary actor in *Halberstam* knew that her companion "was involved in some type of personal property crime at night," and her "continuous participation reflected her intent and desire to make the [criminal] venture succeed." *Id.* (quoting *Halberstam*, 705 F.2d at 487–88) (alteration in original). In contrast, Plaintiffs fail here to plausibly allege that: BNPP had any intention or awareness that it was participating in a scheme to commit the Attacks; BNPP had knowledge of Sudan's use of funds provided by BNPP to fund terrorist activities; or that BNPP's conduct actually enabled the Attacks. Both theories of secondary liability thus fail.

## B.     The Complaint Fails to Plausibly Allege Common Law Conspiracy Liability

The Complaint seeks to inflate the conspiracy BNPP admitted in the June 2014 Agreements of providing Sudanese entities with access to the U.S. financial system in violation of U.S. economic sanctions into a wide-ranging conspiracy with the terrorist group al Qaeda to "defeat U.S. sanctions" at all costs. *See, e.g.*, App. Br. at 18, 27, 30, 31. This theory was properly rejected by the district court and has since been rejected by this Court in a similar context.

33

To plead a civil conspiracy, a plaintiff must allege "(1) an agreement between two or more persons; (2) to participate in an unlawful act"; "(3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam*, 705 F.2d at 477.  Moreover, a civil conspiracy claim requires a showing of a "common intent" with the primary actor.  *Id.* at 480; *Bernhardt*, 47 F.4th at 873 (applying the *Halberstam* factors to terror financing claims).

In *Bernhardt,* this Court recently rejected JASTA conspiracy allegations against HSBC that sought to turn the bank's admitted conspiracy with Iranian and Saudi banks to evade U.S. sanctions into a conspiracy with al Qaeda to commit a terrorist attack on a CIA base.  *Bernhardt*, 47 F.4th at 873.  This Court held there was no common objective between HSBC and al Qaeda because allegations of HSBC's sanctions evasion and allegations that al Qaeda, *inter alia*, "sought to terrorize the U.S. into retreating from the world stage" were "wholly orthogonal to one another."  *Id*.  The Court also concluded that the plaintiffs failed to allege that the terrorist attack was an "overt act that furthered a conspiracy between HSBC and al-Qaeda" because it was not plausible to infer that an attack on a CIA base "would further HSBC's alleged objective of maximizing profits through the evasion of U.S. sanctions."  *Id*; *see also Ungar v. Islamic Republic of Iran*, 211 F.

34

Supp. 2d 91, 100 (D.D.C. 2002) (allegations that Iran conspired with terrorist group loosely affiliated with Hamas to commit terrorist attack in Israel failed to state a conspiracy claim in the "absence of a clear link from the Iran-HAMAS 'partnership'" to the group that perpetrated the attack).

*Bernhardt* confirms that the district court here properly dismissed the Complaint's conspiracy claims for "fail[ure] to plead that BNPP acted in furtherance of a 'common scheme' with al Qaeda to cause tortious harm to plaintiffs, as required to state a claim" under *Halberstam*. JA253 (MTD Decision at 31) (quoting *Halberstam*, 705 F.2d at 477). Here, as in *Bernhardt*, the Complaint fails to plausibly allege that BNPP shared a common objective with al Qaeda to perpetrate the Attacks. To the contrary, the Complaint specifically concedes that "BNPP did not share al Qaeda's desire to kill American citizens and citizens of their allies." *Id.* (quoting Compl. ¶ 3).

Plaintiffs' efforts to distinguish *Bernhardt* based on semantic differences in how al Qaeda's goals are pleaded in each complaint are unavailing. *See* App. Br. at 25 (trying to distinguish *Ofisi* Complaint on ground that it pleads that al Qaeda's goal in carrying out terrorist attacks was, *inter alia*, to "defeat" sanctions). Plaintiffs do not and cannot plausibly articulate how the Attacks furthered BNPP's goal of *evading* U.S. sanctions in order to process financial transactions on behalf of Sudan. Merely labeling both the sanctions violations and the Attacks as actions

in furtherance of the conspiracy's objective to "defeat" the U.S. sanctions whether by "bankers or bombs," App. Br. at 15, does not overcome this logical failing or suggest that the Attacks furthered any objective held by BNPP.  As the district court noted, there is no private right of action for sanctions violations such that a conspiracy to defeat sanctions would even be actionable in a civil lawsuit.  JA253 (MTD Decision at 31).

Plaintiffs' efforts to resort to a broad concept of foreseeability likewise fail to rescue their conspiracy claims.  *See* App. Br. at 26–30.  Relying again on *Boim*, Plaintiffs assert that "BNPP's conduct was itself dangerous to life," and that processing transactions with Sudan was "[l]ike "giving a loaded gun to a child, or giving money to Hamas."  App. Br. at 30–31 (quoting *Boim*, 549 F.3d at 690). This is yet another theory this Court has explicitly rejected:

> While giving fungible dollars to a terrorist organization may be dangerous to human life, doing business with companies and countries that have significant legitimate operations is not necessarily so. That these business dealings may violate U.S. sanctions does not convert them into terrorist acts.

*Bernhardt*, 47 F.4th at 869 (quoting *Kemper v. Deutsche Bank AG*, 911 F.3d 383, 390 (7th Cir. 2018)).[13]  For all these reasons, the district court correctly dismissed the conspiracy claims.

_____

[13]    Nor can Plaintiffs find support for their broad concept of foreseeability in the criminal conspiracy cases on which they rely.  *See* App. Br. at 20, 21, 29.  This Court has instructed that "[t]he extent of a defendant's vicarious liability under conspiracy law is always determined by the scope of his agreement with his

**C.    The District Court Properly Dismissed Plaintiffs' Aiding and Abetting Claims**

The Complaint's aiding and abetting claims are equally deficient under *Halberstam*, which requires allegations that: "(1) the party whom the defendant aids [performed] a wrongful act that cause[d] an injury; (2) the defendant [was] generally aware of his role as part of an overall illegal or tortious activity at the time that he provide[d] the assistance; [and] (3) the defendant . . . knowingly and substantially assist[ed] the principal violation." 705 F.2d at 477.  The district court correctly rejected Plaintiffs' analogy to *Halberstam* as "flawed" because the Complaint fails "to plausibly allege that BNPP directly funded any terrorist group, had knowledge of Sudan's use of BNPP-provided funds to sponsor terrorist activities, or knew that BNPP's conduct actually enabled the attacks."  JA267 (Reconsideration Decision at 9).  Here, again, this Court's recent decision in *Bernhardt* confirms that the district court properly dismissed the aiding and abetting claims.

1.    *The Complaint Fails to Plead that BNPP Was Generally Aware of Its Role in al Qaeda's Terrorist Activities*

---

coconspirators.  Mere foreseeability is not enough[.]"  *United States v. Saro*, 24 F.3d 283, 288 (D.C. Cir. 1994); *see also United States v. Lopesierra-Gutierrez*, 708 F.3d 193, 207 (D.C. Cir. 2013) (cited in App. Br. at 20) (while defendants in alleged drug distribution chain conspiracy need not "know the identity of every other conspirator," courts must "ask whether the participants shared a common goal, were dependent upon one another, and were involved together in carrying out at least some parts of the plan.") (internal citation and quotation marks omitted)).

This Court's recent precedent confirms that the district court here correctly distinguished BNPP's lack of general awareness of its role in al Qaeda's terrorist activities from the live-in partner in *Halberstam*, who was a knowing and "willing partner" in the perpetrator's criminal activities, and whose "continuous participation reflected her intent and desire to make the [criminal] venture succeed." JA267 (Reconsideration Decision at 9) (quoting *Halberstam*, 705 F.2d at 486) (alteration in original).

*Bernhardt* specifically clarified that where, as here, an aiding and abetting claim depends on money flowing through an intermediary to a terrorist actor, the general awareness requirement is satisfied only if: "(1) the defendant was aware of the intermediary's connection to the terrorist organization, and (2) the intermediary is 'so closely intertwined' with the terrorist organization's illegal activities as to give rise to an inference that the defendant was generally aware of its role in the organization's terrorist activities." *Bernhardt*, 47 F.4th at 867–68 (quoting *Honickman v. BLOM Bank SAL*, 6 F.4th 487, 501 (2d Cir. 2021)).

Plaintiffs ignore that in *Bernhardt*, this Court expressly ruled that allegations that HSBC knew of "Iran's support for terrorism [were] not enough to demonstrate HSBC's general awareness that its transactions with Iranian banks would support al-Qaeda's terrorist acts without some 'additional allegations' more closely connecting these intermediary banks to the 'terrorist act or organization.'" *Id.* at

38

868.  This Court also went to on to note that, despite allegations that HSBC was aware of links between its customer, Al Rahji Bank, and terrorism, the plaintiffs "fail[ed] to allege that those connections were so close that HSBC had to be aware it was assuming a role in al Qaeda's terrorist activities by working with Al Rajhi Bank."  *Id.* at 869; *see also Honickman*, 6 F.4th at 501–02 (holding that "limited" public media sources cited in complaint "d[id] not support an inference that [the defendant bank] was aware of [its customers'] ties with Hamas prior to the relevant attacks.").

The claims against BNPP fail a *fortiori*.  Allegations that BNPP was aware of Sudan's "support for terrorism," App. Br. at 27–29, are insufficient under *Bernhardt* to establish that BNPP was generally aware, let alone knew or intended, that by processing funds for Sudan, a sovereign with "legitimate government activities," that "it was playing a role in al-Qaeda's terrorist acts," 47 F.4th at 868.  Likewise, the Complaint relies on allegations regarding Al Shamal's ties to al Qaeda, but fails to allege that that BNPP was aware of these connections.  JA83– 88 (Compl. ¶¶ 154–76).  The Complaint makes conclusory allegations that BNPP "processed transaction [sic] on behalf of Al Shamal, the proceeds of which were delivered to Al Qaeda for operations,"  but fails to identify any facts demonstrating this relationship between BNPP and Al Shamal.  JA86 (Compl. ¶ 167).  Indeed, the only report regarding Al Shamal's connection to al Qaeda cited by the Complaint

that predates the 1998 Attacks is a 1996 State Department Report stating that "Bin Laden and wealthy National Islamic Front members capitalized Al Shamal in Khartoum.  Bin Laden invested $50 million in the bank."  JA84 (Compl. ¶ 158).  However, as the district court noted, "the complaint does not even allege that BNPP was aware of the 1996 State Department Report . . . let alone assert any facts showing BNPP's knowledge of the report."  JA238 (MTD Decision at 16).  The relationship between Al Shamal and Bin Laden was not widely reported on until *after* the 1998 Attacks.  JA238–39 (MTD Decision at 16–17) (citing Compl. ¶¶ 160, 161, 162).

This Court in *Bernhardt* deemed insufficient allegations that Al Rahji Bank was "founded by a key financial contributor to al Qaeda;" maintained accounts for al Qaeda fronts, and "facilitated transactions for terrorists" to establish general awareness as to HSBC's aiding and abetting of an al Qaeda attack.  *Bernhardt*, 47 F.4th at 868–69; *see also Siegel v. HSBC N. Am. Holdings, Inc.*, 933 F.3d 217, 224 (2d Cir. 2019) (rejecting general awareness allegations against HSBC in separate suit involving its relationship with Al Rahji where, "[a]t most, the allegations, even when viewed in the light most favorable to the plaintiffs, assert that HSBC was aware that [Al Rahji] was believed by some to have links to [al Qaeda Iraq] and other terrorist organizations," and not that "HSBC knowingly played a role in [al Qaeda Iraq's] terrorist activities").  Plaintiffs' additional assertion here that "[u]pon

40

information and belief, BNPP processed transaction[s] on behalf of Al Shamal, the
proceeds of which were delivered to al Qaeda for . . . planning and perpetrating the
embassy bombings," JA86 (Compl. ¶ 167), is devoid of any supporting factual
allegation, and need not be accepted by the Court, JA239 (MTD Decision at 17).

Plaintiffs do not even try to distinguish *Bernhardt* on the general awareness
element. Instead, they seek to rely on *Atchley v. AstraZeneca UK Ltd.*, 22 F.4th
204 (D.C. Cir. 2022), which, unlike *Bernhardt* and *Ofisi*, involved extensive
allegations of a *knowing and direct* relationship between the defendants and the
terrorist actor. *See* App. Br. at 32. Unlike here, the complaint in *Atchley* detailed
the close ties between the terrorist actors and the corporate defendant including
that the defendants knowingly bribed a "notoriously corrupt Ministry under the
control of a terrorist group," and sent their agents to meetings held in offices where
"armed terrorist fighters circulated openly and anyone who entered could see [the
terrorist group's] distinctive flag, weapons, Sadr posters, and 'Death to America'
slogans on display." 22 F.4th at 221. Nothing like this was, or could be alleged
against BNPP here, and accordingly the district court correctly rejected the aiding
and abetting claims for failing to plead general awareness.

2.    *The Complaint Fails to Plead BNPP's Knowing and Substantial
       Assistance to al Qaeda*

The aiding and abetting claims also independently fail to satisfy the knowing
and substantial assistance element. Six factors are relevant to this element: (1) "the

41

nature of the act encouraged"; (2) "the amount and kind of assistance given"; (3) "the defendant's absence or presence at the time of the tort"; (4) the defendant's "relationship to the tortious actor"; (5) "the defendant's state of mind"; and (6) the "length of time an alleged aider-abettor has been involved." *Halberstam v. Welch*, 705 F.2d 472, 483–84 (D.C. Cir. 1983). "No factor alone is dispositive, and the weight of each varies with the circumstances of the particular claim. What is required is that, on balance, the relevant considerations show that defendants substantially assisted the acts of terrorism." *Atchley*, 22 F.4th at 221. The district court properly concluded that the Complaint fails to plead sufficiently that BNPP provided knowing and substantial assistance to the Attacks.

*(1) Nature of the Act Encouraged.* Plaintiffs do not allege that BNPP "encouraged" bombings, or indeed provided anything to al Qaeda. *See Siegel*, 933 F.3d at 225 ("The plaintiffs here have not plausibly alleged that HSBC encouraged the heinous November 9 Attacks or provided any funds to [al Qaeda Iraq]."). To bridge the gap, Plaintiffs claim in broad terms that "BNPP's deliberate design of a financial stability scheme for a state-sponsor terrorism [sic]—when otherwise unable to conduct U.S. dollar transactions and to obtain those dollars . . . allowed Al-Qaeda access to U.S. dollars in the year leading up to the 1998 Embassy bombing attacks." App. Br. at 34 (citing JA85–86 (Compl. ¶ 163)). This allegation is even more attenuated than the plaintiffs' claims in *Bernhardt*. As

noted above, Plaintiffs have not plausibly alleged *any* transactions processed by BNPP on behalf of Sudan or Sudanese commercial banks prior to 1998, let alone established that BNPP's activities in the months between the enactment of U.S. sanctions and the Attacks were necessary to the "stability" of Sudan, which in turn was somehow necessary to al Qaeda's attacks on the embassies.

*(2) Amount of Assistance*. "The second factor is 'significant' and requires considering the quantity and quality of aid." *Bernhardt*, 47 F.4th at 871 (quoting *Halberstam*, 705 F.2d at 484). In *Bernhardt*, the allegation that "HSBC facilitated over $19 billion in transactions with Iranian institutions and provided almost $1 billion in currency sales to Al Rajhi Bank" was still insufficient to satisfy the second factor given the lack of allegations as to "how much (if any) of that money indirectly flowed to al-Qaeda." 47 F.4th at 871; *see also Siegel*, 933 F.3d at 225 (although plaintiffs alleged the provision of "hundreds of millions of dollars" to an intermediary, "they did not advance any non-conclusory allegation that [al Qaeda Iraq] received any of those funds"). Here, Plaintiffs do not allege that *any* particular banking services or transactions processed by BNPP relate to the Attacks, much less that they were a "major part" or "integral" to the bombings. All references to volumes of transactions have to do with activities several years *after* the Attacks. *See* JA239 (MTD Decision at 17) (noting that the Complaint contains "no detailed factual allegations" that support the allegation that "BNPP processed

43

U.S. dollar transactions for Al Shamal before the embassy bombings"). *Bernhardt* and *Siegel* are *a fortiori* here given the lack of any allegations that *any* funds were processed by BNPP for Sudan or Sudanese banks in the limited period between November 1997 and the August 1998 Attacks, let alone funds flowing to al Qaeda. *See supra* at 11–12.

(3) *Defendant's presence or absence at the time of the tort*.  As Plaintiffs concede, BNPP was not present at the Attacks and this factor weighs against liability.  App. Br. at 36.

(4) *Defendant's relationship to the principal*.  Plaintiffs do not and cannot assert a direct connection between BNPP and al Qaeda.  Again they seek to extend the alleged relationship among BNPP and Sudanese banks and the government of Sudan to the customers of those banks and al Qaeda leadership.  *See* App. Br. at 36–37.  However, this attenuated chain is insufficient for purposes of this factor. *See Bernhardt*, 47 F.4th at 872 ("Bernhardt does not allege a connection between the foreign banks and al-Qaeda sufficient to infer any relationship, much less a close one, between HSBC and al-Qaeda.").  In addition, as explained above, Plaintiffs' allegations regarding the ties between BNPP, Al Shamal and al Qaeda prior to the Attacks are naked assertions wholly devoid of support.

(5) *Defendant's state of mind.*  In *Halberstam*, the partner had actual knowledge of the ongoing tortious activity of her companion:  She knew that her

44

companion "was involved in some type of personal property crime at night," and her "continuous participation reflected her intent and desire to make the [criminal] venture succeed." *Halberstam*, 705 F.2d at 487–88; *see also Bernhardt*, 47 F.4th at 872 ("Bernhardt fails to allege that HSBC provided knowing assistance or was generally aware that acts of terrorism were the foreseeable result of its actions."). Here, as discussed *supra* at 39–40, the Complaint fails to plausibly allege any "general awareness" by BNNP of any involvement in terrorist activities.  Rather, the allegations reflect no more than the opening of accounts in Switzerland in 1997 for Sudanese commercial banks, with no allegation as to the transactions processed in the short period preceding the August 1998 Attacks or that BNPP acted with knowledge that any transactions had any connection to the Attacks.

*(6) Duration of the assistance*.  The Complaint does not contain any well-pleaded allegations that BNPP processed any transactions at all during the narrow period between the onset of the U.S. sanctions against Sudan and the beginning of BNPP Geneva's relationships with Sudanese banks in November 1997 and the date of the Attacks, August 7, 1998, the only time during which Plaintiffs could even theoretically allege that BNPP could have proximately caused the Attacks.  *See supra* at 11–12.  But even if the Court infers that BNPP did process transactions for Sudan during this short time period, this element would still weigh in BNPP's favor.  In considering alleged assistance over the course of a far longer period in

45

*Bernhardt*, this Court nonetheless found that this factor weighed against liability, concluding that "[b]ecause the foreign banks are global financial institutions with legitimate operations and uncertain ties to al-Qaeda, we cannot infer substantial assistance to al-Qaeda from HSBC's lengthy business relationships with the foreign banks." *Bernhardt*, 47 F.4th at 872. By contrast, in *Atchley*, 22 F.4th at 224 the sixth factor was satisfied where the complaint described "a set of enduring, carefully cultivated relationships consisting of scores of transactions [with the terrorist-controlled entity] over a period of years"—a far cry from what is alleged here.

Plaintiffs have failed to establish any direct relationship between BNPP and the perpetrators of the Attacks. Thus, the dismissal of the common law claims for aiding and abetting should be affirmed.

## CONCLUSION

For all the foregoing reasons, the district court's ruling should be affirmed.

Dated:  December 1, 2022

Respectfully submitted,

CLEARY GOTTLIEB STEEN & HAMILTON LLP

By: _____

Carmine D. Boccuzzi, Jr.
Mark E. McDonald
Katherine R. Lynch
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000
cboccuzzi@cgsh,com

*Attorneys for Appellees BNP Paribas, S.A.*

## STATEMENT OF COMPLIANCE

I certify that this document complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) and Circuit Rule 32, this document contains 11,350 words, as calculated by Microsoft Word.

I further certify that this document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

_____
Carmine D. Boccuzzi, Jr.
Mark E. McDonald
Katherine R. Lynch
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000
cboccuzzi@cgsh.com

*Attorneys for Appellees BNP Paribas, S.A.*

48

## CERTIFICATE OF SERVICE

I hereby certify that on December 1, 2022, the foregoing Brief was filed

and served through the Court's electronic filing system.

_____

Carmine D. Boccuzzi, Jr.
Mark E. McDonald
Katherine R. Lynch
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, NY 10006
(212) 225-2000
cboccuzzi@cgsh,com

*Attorneys for Appellees BNP Paribas,*
*S.A.*

# ADDENDUM

# STATUTORY ADDENDUM

## TABLE OF CONTENTS

**DOCUMENT**                                          **PAGE NUMBER**

18 U.S.C. § 2333                                          ADD1

Add. 1

18 U.S. Code § 2333 - Civil remedies

(a) ACTION AND JURISDICTION.  Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

(b) ESTOPPEL UNDER UNITED STATES LAW.  A final judgment or decree rendered in favor of the United States in any criminal proceeding under section 1116, 1201, 1203, or 2332 of this title [18 USCS § 1116, 1201, 1203, or 2332] or section 46314, 46502, 46505, or 46506 of title 49 shall estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

(c) ESTOPPEL UNDER FOREIGN LAW.  A final judgment or decree rendered in favor of any foreign state in any criminal proceeding shall, to the extent that such judgment or decree may be accorded full faith and credit under the law of the United States, estop the defendant from denying the essential allegations of the criminal offense in any subsequent civil proceeding under this section.

(d) LIABILITY.

(1) Definition. In this subsection, the term "person" has the meaning given the term in section 1 of title 1 [1 USCS § 1].

(2) Liability. In an action under subsection (a) for an injury arising from an act of international terrorism committed, planned, or authorized by an organization that had been designated as a foreign terrorist organization under section 219 of the Immigration and Nationality Act (8 U.S.C. 1189), as of the date on which such act of international terrorism was committed, planned, or authorized, liability may be asserted as to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism.

(e) USE OF BLOCKED ASSETS TO SATISFY JUDGMENTS OF U.S. NATIONALS.  For purposes of section 201 of the Terrorism Risk Insurance Act of 2002 (28 U.S.C. 1610 note), in any action in which a national of the United States has obtained a judgment against a terrorist party pursuant to this section, the term "blocked asset" shall include any asset of that terrorist party (including the blocked assets of any agency or instrumentality of that party) seized or frozen by the United

States under section 805(b) of the Foreign Narcotics Kingpin Designation Act (21 U.S.C. 1904(b)).